UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DERRICK STEWART,<br>*on behalf of himself, FLSA Collective Plaintiffs, and the Class,*<br><br>Plaintiffs,<br><br>v.<br><br>HUDSON HALL LLC<br>    d/b/a MERCADO LITTLE SPAIN,<br>HUDSON HALL HOLDINGS LLC<br>    d/b/a MERCADO LITTLE SPAIN,<br>THINK FOOD GROUP, LLC,<br>and JOSÉ RAMON ANDRÉS PUERTA<br>    a/k/a JOSÉ ANDRÉS,<br><br>Defendants. | Case No.: 1:20-cv-00885<br><br>**DECLARATION OF DERRICK STEWART** |

**DECLARATION OF DERRICK STEWART**

I, DERRICK STEWART, under penalty of perjury, affirm as follows:

1. On or around March 1, 2019, I began working for Defendants to work as a non-managerial line cook. I was terminated in or around September 2019.

2. Starting on March 1, 2019, I worked for Defendants' Leña Restaurant located inside MERCADO LITTLE SPAIN at 10 Hudson Yards, New York, NY 10001 ("Little Spain Marketplace").

3. A month or so later (as best I recall), I was transferred internally to work at the Spanish Diner Restaurant located inside MERCADO LITTLE SPAIN. Also around the same time, I began working four additional shifts at the Frutas & Verduras Kiosk inside MERCADO LITTLE SPAIN.

DocuSign Envelope ID: 7A812D12-1B0B-48E3-AE7B-358279329DAA
Case 1:20-cv-00885-PGG-SLC   Document 63   Filed 12/04/20   Page 2 of 6

4. From June 2019 until the end of my employment with Defendants, I worked primarily at the Spanish Diner Restaurant and Frutas & Verduras Kiosk, but I also worked at the other Restaurants and Kiosks on an as needed basis.

5. From March 1, 2019 to May 13, 2019, I typically worked five (5) days per week for at least seven (7) hours per day, for a total of at least thirty-five (35) hours each week at an hourly rate of $17.00. Often, I would work up to forty (40) hours per week.

6. From May 13, 2019 to in or around September 2019, I typically worked five (5) days per week for at least nine (9) hours per day, for a total of at least forty-five (45) hours each week at an hourly rate of $17.00. Sometimes, I worked ten (10) or eleven (11) hours per shift.

7. Between May 20, 2019 to May 26, 2019, I worked in excess of 52.94 hours and was paid a straight rate of $17.00 for a total of $899.98. Based on my conversations with the individuals listed in ¶ 17 below, Defendants also failed to pay overtime premiums to other employees.

8. Additionally, Defendants used a variety of mechanisms to time shave me and other employees at both the beginnings and ends of our shifts.

9. I and other kitchen employees were required to appear at the Little Spain Marketplace long before our scheduled start time, and before we were allowed to clock-in. As part of our expected duties, we were required to change into the company uniform and drop-off our equipment in the company locker-room. Little Spain Marketplace required our uniform for aesthetics, and because we were in the food-industry, to ensure cleanliness of those handling food. As Little Spain Marketplace has hundreds of employees, the wait for the locker-room to change was significant, especially as the locker was co-ed, with cameras inside. Those wanting privacy to change had to use the bathroom stalls, of which there were only two, so the wait was then even longer.

10. Moreover, kitchen workers were required to bring their own equipment, such as knives, to work, and the locker-room contained a very limited number of lockers in which to store this equipment. So it took additional time to find a locker not in use, or find a person both trustworthy and willing to share. Additionally, as Little Spain Marketplace was a large facility, it took additional time to walk from the locker-room to our workstations, which housed the only machines where we could clock-in. Between the wait to change into our uniform, the hunting down of an available locker, and the walk over to our stations to clock-in, a significant amount of unpaid time accrued. Additionally, managers would often ask for my assistance on various tasks as soon as I left the locker room and before I could reach my workstation to clock-in, so this work also went uncompensated. Together, these off-the-clock activities amounted to an average of 15-20 minutes of uncompensated pre-shift work time every day.

11. Defendants had a policy where employees could only clock-in or clock-out for a ten (10) minute window at the start or end of our shifts. If we tried to clock-in or clock-out more than five minutes before or after our scheduled time for doing so, we would require a manager's approval. The machine simply would not let us clock in or out unless it facially recognized a manager.

12. This policy led to significant time shaving at the beginning of my shifts (and those of other employees). Because it was difficult to find managers to make their way to a machine and clock us in, I and other employees would have to begin working without clocking in at least three to four times a week. Even when I did succeed in clocking in, I would have to spend at least 10-15 minutes looking for an available manager to enable this. I would write down the actual time when I started working and later give it to a manager to input into the system. But less time would be inputted into the system than I had actually worked. Other employees complained of the same problem.

13. Defendants would exploit the narrow window for clocking in and out to shave my time at the end of my shift as well. Since practically no one was ready to clock-out within five (5) minutes of the scheduled time, we would nearly always need managerial approval. Managers would then want to clock us out all at the same time, so as not to have to deal with the issue again. Once they did that, however, they would ask us to stay on and complete various necessary tasks, like cleaning and scrubbing the floor, and promised to add the additional time to our timesheets, but they never actually did this. I was usually expected to perform these off-the-clock work tasks for an average of thirty (30) minutes after the close of each scheduled shift, four (4) times per week. Therefore, I performed an average of two (2) hours of off-the-clock work each week, due to this mandated off the clock work. Based on my direct observations and conversations with other employees, including those listed in ¶ 17 below, my coworkers were similarly time-shaved.

14. Beyond this, walking back to the locker room and waiting for a bathroom stall to open (so I could change out of my uniform) also added an additional 10-15 minutes of post-shift work time at the end of the shift every day.

15. Defendants deducted all break times, even those times, which lasted less than twenty (20) minutes. Defendants also deducted break times for breaks that I and other employees were too busy to actually take.

16. I personally observed that other employees were subject to the same policies and often complained to managers about the time-shaving. My co-workers and I frequently talked to each other about Defendants' pay policies before work while working off-the-clock, during breaks, and also after work. Everybody routinely complained about how unfair it was that Defendants were not paying us properly for all hours we worked. We complained that these

couple hours each week would really start adding up over time, but we would never be paid for those hours.

17. Based on my personal observations and conversations with other employees, all other employees employed by Defendants in regardless of Restaurant or Kiosk within the MERCADO LITTLE SPAIN were subject to the same unlawful wage and hour policies described above. Such co-workers include, but are not limited to:

| Name | Position | Location |
|---|---|---|
| Shana Ramington | Line Cook | Lena and Mar |
| Shannon Brown | Line Cook | Spanish Diner |
| Stephanie Cantao | Line Cook | Spanish Diner |
| Jerry [LNU] | Porter | Various Locations |
| Quana [LNU] | Barista | Unknown |
| Xavier Scott [LNU] | Line Cook | Lena and All Kiosks |

18. I would frequently speak with my co-workers in the locker-room, during breaks and after-work about the issues at Little Spain Marketplace. I remember a couple instances in June of 2019 riding the train back with Quana and Xavier, where they stated they would frequently try and get management to fix their hours, because they were getting it wrong, and also expressed frustration with the every morning's delay in clocking in, which occurred due to the locker-room and need for managerial approval.

19. I remember a few instances in July 2019 running into Shana, Shannon, and Stephanie outside the locker-room before we were allowed to clock-in. We always complained that it was "a zoo" and took "forever" to get changed and over to our station. We all thought it was unfair, that Defendants required us to get in early to change, find a locker to store our required equipment, then walk all the way across the marketplace before allowing us to finally clock-in, that is if we were lucky enough to arrive in the ten (10) minute window mandated by Defendants.

20. I also remember later, when I spoke with Shannon about the above issues, he said "they doing all that to me too." We would complain to the managers Sadaam and Jose about all our missing hours, and they would always say "don't worry" or "I got you" or "I'll adjust it," but they never did.

21. In September of 2019, after I had ceased working for Defendants. I spoke with both Shana and Shannon around Hudson Yards. They were still working at Little Spain Marketplace. And they complained to me again about the unfairness of their time keeping and complained that the locker-room situation was still a mess.

22. When I was hired by Defendants, I did not receive a wage and hour notice as required under New York Labor Law, and Defendants never informed me of how to obtain one. Based on my personal observations and conversations, no other employee ever received a written wage and hour notice at the time of hiring or thereafter, informing them of their rates of pay or other requirements under the New York Labor Law.

23. During my employment with Defendants, I received wage statements from Defendants, but they failed to state the correct number of hours that I worked each week, due to Defendants' time shaving policies. Based on my personal observations and conversations with my co-workers, other employees received similar improper proper wage statements.

24. I do not have any conflicts with prospective class members.

Dated: 11/30/2020

DocuSigned by:
Derrick Stewart
4A15CBFB240643D...

Derrick Stewart